PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 21-2192
_____

ROBERT D. MABE, INC.; ABINGTON PHARMACY,
INC.;
JAC STORES, INC.; BIEN PHARMACY, INC.; BLENDE
DRUG, INC.;
WULLSTEIN PHARMACY, INC.;
BUCHANAN BROTHERS PHARMACY, INC.;
CARROLL APOTHCARY, INC.; CARROLL
APOTHCARY, LTC.;
CONCORD, INC.; DELRAY SHORES PHARMACY,
INC.;
K.V.H., INC.; ELLENSBURG DOWNTOWN
PHARMACY, INC.;
ERIC'S RX SHOPPE, LLC; FERGUSON REXALL
DRUG, INC.;
FOX DRUG, INC.; CATHRON, INC.; KZ
ENTERPRISES, LLC;
RCH PHARMACY SERVICES, LTD.; PHARMACY
SERVICES, INC.;
HINES PHARMACY, INC.; HINES PHARMACY AT
WKOA.;

E R BLACK PHARMACY, INC.; FAMILY PHARMACY;
J&S PROFESSIONAL PHARMACY, INC.;
VOSMEK DRUG STORE, INC.;
MESA PHARMACY OF PUEBLO, INC.;
PARKWAY DRUGS OF ONEIDA COUNTY;
PARKWAY DRUGS OF ONEIDA COUNTY NORTH, INC.;
PARKWAY DRUGS OF ONEIDA COUNTY SOUTH, INC.;
STREET ROAD PHARMACY, INC.;
PHILADELPHIA PHARMACY, INC.; PHILIP E. PEPPER, INC.;
PRESSMAN, INC.; CHELSEA DRUGS, INC.;
RASHID PHARMACY, PLC; SHAKTI PHARMACY, INC.;
RED CROSS PHARMACY, INC.;
REED DISCOUNT PHARMACY, INC.; REED PHARMACY, INC.;
GNSP CORP.; SAVALL DRUG, INC.; L&M PHARMACY, INC.;
SUBURBAN BUSTLETON PHARMACY, INC.;
RCL PHARMACY SERVICES, INC.;
OPERA HOUSE PHARMACY COMPANY; SPIVACK, INC.;
TOWN AND COUNTRY PHARMACIES, INC.;
WILLIAM J. FARLANDER, INC.; WHITMAN PHARMACY;

MEDS AND MORE, INC., d/b/a Meds & More;
CARROLLTON DRUGS, INC., d/b/a Carrollton Drugs;
BOWEN PHARMACY, LLC, d/b/a Bowen Pharmacy;
BALL GROUND PHARMACY, LLC, d/b/a Ball Ground
Pharmacy;
BREN-MAK, LLC, d/b/a Corner Drugs;
HITCHCOCK RX, INC., d/b/a Jack's Discount Pharmacy;
LITTLE DRUG COMPANY, LLC, d/b/a Little Drug
Company;
BROWN'S DRUG STORE, d/b/a Brown's Drug Store;
PARKHILL PHARMACY, INC., d/b/a Lopez Island
Pharmacy;
ANKENY APOTHECARY, INC., d/b/a Medicap
Pharmacy #8015;
PROFESSIONAL PHARMACY, LLC, d/b/a Professional
Pharmacy;
DESERT SKY PHARMACY, LLC, d/b/a Desert Sky
Pharmacy;
MT. VERNON COMMUNITY PHARMACY, INC.,
d/b/a The Medicine Shoppe, #0560;
BEDFORD PHARMACY, INC., d/b/a Bedford Pharmacy;
MEDSCENE, INC., d/b/a Crown Drugs;
DELCO PHARMACY, INC., d/b/a Delco Pharmacy;
LINSON PHARMACY LIMITED (S-Corp), d/b/a Linson
Pharmacy;
TAMP, INC., d/b/a Pomarico's Pharmacy;
REDNER'S MARKETS, INC.,
d/b/a Redner's Pharmacy, Redner's Pharmacy #21,

3

Redner's Pharmacy #22, Redner's Pharmacy #23;
WASHCHKO'S PHARMACY, INC., d/b/a Waschko's
Pharmacy
LARSEN SERVICE DRUG, INC.,
d/b/a Larsen Service Drug-New Town and Larsen Service
Drug-Watford City;
KELLY KIDZ, d/b/a Kapler's Pharmacy;
8TH STREET PHARMACY, LLC, d/b/a 8th Street
Pharmacy;
ACADEMY PHARMACY, LLC, d/b/a Academy
Pharmacy;
BOUNT'S MUTUAL DRUGS, INC., d/b/a Blount's Mutual
Drugs;
PUBLIC DRUG COMPANY; CHAPMAN
HEALTHCARE PHARMACY, INC.;
CHELTEN DRUG INC.; COBB'S WESTSIDE
PHARMACY, INC.;
CRITTENDEN'S DRUG, INC.; DAHLONEGA
PHARMACY, INC.;
DON'S PHARMACY, INC.; NEFF DRUGS 8, LLC;
FRIENDLY PHARMACY, INC.; FRIENDSHIP
PHARMACY, INC.;
GLENDALE PRESCRIPTION CENTER, INC.;
GOOD PHARMACY, LLC; HEREFORD PHARMACY,
INC.;
HANDI CAPABLE, INC.; BHS; PHARMACY CARE
CENTERS, LLC;
PHREDS DRUG, INC.; PROFESSIONAL PHARMACY

4

OF OXFORD, LLC;
RANN PHARMACY, INC.; REESER'S PHARMACY,
INC.;
SMITH BROTHERS DRUG COMPANY, INC.;
SOUTH END PHARMACY, INC.;
OLD BALTIMORE PIKE APOTHECARY, INC.;
SSJARS, INC.; TOTAL CARE RX, INC.;
BOYD'S PHARMACY OF BORDENTOWN, INC.;
BOYD'S PHARMACY OF FLORENCE, INC.;
CRYSTAL CITY APOTHECARY, LLC; GAYCO, INC.;
NOVA STAR PHARMACY, INC.; R W GROUP, INC.;
RIPLEY DRUG CO.;
SHIRLEY COURT PHARMACY, INC.; ADD, INC.;
WAKEEM, INC.;
WALLY'S PHARMACY, INC.; WALTER'S
PHARMACY, INC.;
BOYD'S PHARMACY OF MANSFIELD, INC.;
BOYD'S PHARMACY OF MEDFORD, INC.;
BOYD'S PHARMACY OF PEMBERTON, INC.; CABEL
L. JONES, III;
COMMUNITY DRUG, INC.; MEG'S PHARMACY, INC.;
COLOSSEUM, INC.; DAMIANO PHARMACY (S-Corp)
DAVIS CUT RATE DRUGS, INC.; DR. IKE, INC.;
ESTERBROOK PHARMACY, LLC; BOBO DRUGS,
INC.;
PHARMAKON, LLC; FUNK PHARMACY, INC.;
GATEWAY PHARMACY OF PHOENIXVILLE, INC.;
HARBOR DRUG, INC.; HEALTHY WAY PHARMACY,

5

INC.;
NRX RX, INC.; PELELLA APOTHECARY, INC.; JBD,
INC.;
HENRIETTA PHARMACY;
HOLLYWOOD DISCOUNT PHARMACY, INC.;
BROWN & GOBIN, INC.;
LONOKE HEALTH & WELLNESS; MACE
PHARMACY, INC.;
MALAND, INC.; MEDISAVE, INC.; LAMAR &
SEYMOUR, LLC.;
MT. CARAMEL MEDICAL; NEWHARD PHARMACY,
INC.;
SYL-MAX PHARMCARE, INC.; PEOPLES DRUG
STORE;
PHARMACY CARE, INC.; PHARMAHEALTH
HAWTHORN, INC.;
PHILLIPS DRUGS, INC.; POINCIANA PHARMACY,
LLC.;
POTTERVILLE PHARMACY, INC.; DAO PHARMACY,
INC.;
PAUL REED ENTERPRISES, INC.(S-Corp);
QUIK-STOP PHARMACY OF BARLEY STN, INC.;
RICCIO FAMILY PHARMACY, INC.;
RINGS DRUGS, LTD.; MMRX HEALTHSOLUTIONS,
INC.;
RX EXPRESS; ROCKWOOD PHARMACY;
S & S CORPORATION; SCHAEPER PHARMACY,
INC.;

6

SEAWAY PHARMACY, PC.;
SHERMAN'S APOTHECARY PHARMACY, INC.,
d/b/a Sherman's Apothecary Pharmacy;
SMITH'S PHARMACY II, INC., Smith's Pharmacy II;
SMITH'S PHARMACY III, INC., d/b/a Smith's Pharmacy
III;
SOUTHERN DISCOUNT DRUGS OF CHARLESTON,
INC.,
d/b/a Southern Discount Drugs of Charleston;
MEDICINE SHOPPE, LTD, d/b/a Stephens Pharmacy;
REVRAC INDUSTRIES, INC., d/b/a Stony Point
Pharmacy;
RICHARD L. BERRY PHARMACY, INC.,
d/b/a The Medicine Shoppe #1086 and The Medicine
Shoppe#1759;
WILSON DRUG, INC., d/b/a Tillamook Pharmacy;
FLEMING PHARMACIST GROUP, INC.,
d/b/a Total Care Pharmacy#1 and Total Care Pharmacy #2;
GRANT PHARAMACIST GROUP, INC.,
d/b/a Total Care Pharmacy #3 and Total Care Pharmacy #4;
PENDLETON PHARMACIST GROUP, INC.,
d/b/a Total Care Pharmacy #5;
ROWAN PHARMACIST GROUP, INC.,
d/b/a Total Care Pharmacy #6 and total Care Pharmacy #7;
KL ARNOLD ENTERPRISE, INC.,
d/b/a West Point Pharmacy;
VISELS DRUG STORE, INC., d/b/a Visels Pharmacy;
JGBLA, INC., d/b/a West Hempstead Pharmacy;

7

RJ PROFESSIONALS, INC., d/b/a Young's Pharmacy;
RUDI PHARMACY, INC., d/b/a Philadelphian Pharmacy;
WALKER DRUG COMPANY, INC., d/b/a Walker Drug;
HARRIS PHARMACY, INC., d/b/a Harris Pharmacy;
NEFF DRUGS 5, LLC, d/b/a 18th Street Apothecary;
TANDONS ADVANCED PHARMACY, d/b/a Advanced Health Pharmacy;
CARIBBEAN PHARMACY, INC., d/b/a Caribbean Pharmacy;
CASTOR PHARMACY & SURGICAL SUPPLIES, LLC, d/b/a Castor Pharmacy;
CENTRAL CITY FAMILY PHARMACY, INC., d/b/a Center Point Family Pharmacy;
CHRISTOFANO ASSOCIATES, LLC, Hayden's Pharmacy 1 and Hayden's Pharmacy 2;
CIRCLE PHARMACY, LLC, d/b/a Circle Pharmacy;
CONDO, INC., d/b/a Condo Pharmacy;
COOKS PHARMACY OF KINGSTON, INC., d/b/a Cook's Pharmacy of Kingston;
CRESTWOOD PHARMACY, LLC, d/b/a Crestwood Pharmacy;
DAKES DRUG STORE, INC., d/b/a Dakes Drug Store;
DOC'S DRUGS, LTD.;
ESCO DRUG COMPANY, INC., d/b/a Esco Drug;
FOREST HILLS PHARMACY, INC., d/b/a Forest Hills Pharmacy;
GETWELL PHARMACY CORP., d/b/a Getwell Pharmacy Corp.;

8

HOMETOWN VILLAGE PHARMACY, LLC,
d/b/a Hometown Village Pharmacy;
JOHNSON'S PHARMACY,
d/b/a Johnson's Pharmacy of Hazelton;
KEYSTONE PHARMACY(S-CORP.), d/b/a Keystone
Pharmacy;
KIM DO, INC., d/b/a M.R. Pharmacy;
MCNEILL FAMILY PHARMACY, INC.,
d/b/a Aston Pharmacy Home Health Center;
NEFF DRUGS 20, LLC, d/b/a Farmacia Rayo De Sol;
NEFF DRUGS 21, LLC, d/b/a Farmacia Sunray;
NEFF DRUGS, INC., d/b/a Baederwood Pharmacy;
NEFF MERION ENTERPRISES, INC., d/b/a Babis
Pharmacy;
PHARMACY SHOP, INC., d/b/a Ed Snell's Pharmacy
Shop;
RJ JOMICI, INC., d/b/a Jomici Apothecary;
RIAZ U RAHMAN, d/b/a Getwell Pharmacy;
INDEPENDENT RX, INC., d/b/a Olde Philly Pharmacy;
MIDDLETOWN CHEMISTS, INC., d/b/a NeighboRx
Pharmacy;
MILLS FAMILY PHARMACY, LLC,
d/b/a Mills Family Pharmacy;
NEWPOINTE PHARMACY, LLC,
d/b/a Newpointe Pharmacy;
NICE PHARMACY, INC., d/b/a Nice Pharmacy;
PACKER APOTHECARY, INC., d/b/a Packer Apothecary
PAW PAW VILLAGE DRUG, d/b/a Paw Paw Village

Pharmacy;

V.V. INC., d/b/a ND Pharmacy;

EKLUND DRUG, INC., d/b/a Preston's Pharmacy;

IGM, INC., d/b/a Rapoport Pharmacy;

NEFF DRUGS 12, LLC,
d/b/a Sunray Drugs 56th&Market Street;

NEFF DRUGS 6, LLC,
d/b/a Sunray Drugs Baltimore Avenue;

NEFF DRUGS, 11, LLC,
d/b/a Sunray Drugs 60th Street;

OPIERX, INC., d/b/a S& B Drugs;

PROFESSIONAL PHARMACY AND CONVALESCENT
PRODUCTS, LTD,
d/b/a Professional Pharmacy;

RAMON PHARMACY, INC., d/b/a Ramon Pharmacy;

RESOLUTION RX, INC., d/b/a Resolutin Rx;

RINGS DRUG, LTD, d/b/a Rings Drug;

SAMUEL J ROBINSON PHARMACY, INC.,
d/b/a SJ Robinson Pharmacy;

SHEEANS PHARMACY, INC., d/b/a Sheeans Pharmacy;

SUNRAY DRUGS, LLC, d/b/a Sunray Drugs;

TWO FISHES, INC., d/b/a Roger's Family Pharmacy;

DANIEL RAIF, INC., d/b/a The Medicine Shoppe#0188;

GRIFFIN DRUGS, INC., d/b/a Thrift Drugs;

KARWASKI PHARMACY, INC.,
d/b/a The Medicine Shoppe-Dallas (#1251);

NEFF DRUGS 13, LLC, d/b/a Sunray Drugs Chestnut
Plaza;

10

PHC PHARMACIES, INC., d/b/a The Medicine
Shoppe#1330
and The Medicine Shoppe#1397;
SLV PHARMACY, INC., d/b/a Valley Pharmacy &
Surgical Supplies;
SSV PHARMACY, LLC, d/b/a The Medicine
Shoppe#1404;
SCHROPP PHARMACY, INC.,
d/b/a The Medicine Shoppe #0146;
SHIRLEY COURT PHARMACY, INC.,
d/b/a Upper Darby Family Pharmacy;
THE ROBBINS PHARMACY (S-CORP),
d/b/a The Robbins Pharmacy;
CLLAMP CO., INC., d/b/a Medicap Pharmacy#8213;
FAIRMOUNT PHARMACY SERVICES, INC.,
d/b/a Fairmount Pharmacy Services;
FOREST HILLS PHARMACY, INC., d/b/a FHP
Pharmacy Services;
GRANITE STATE PHARMACY, LLC, d/b/a Granite
State Pharmacy;
HEALTH SPECTRUM, d/b/a Wonder Drug;
HUSACK HOLDINGS, JPL, d/b/a The Medicine Shoppe-
Berwick;
J.B.M. INC., d/b/a Village Pharmacy At Springhouse;
JJM ENTERPRISES, INC., d/b/a Gem Pharmacy;
KEDO, LLC, d/b/a Valumed Pharmacy-Coralville;
MADSEN, INC., d/b/a Medicap Pharmacy; #8019;
MEDCARE LTC, LLC, d/b/a Medcare LTC;

11

NEFF DRUGS 22, LLC, d/b/a Village Shires Pharmacy;
SPRINGFIELD PHARMACY, INC., d/b/a Village
Pharmacy(Queens Village);
SUGAR RIVER PHARMACY, LLC, d/b/a Sugar River
Pharmacy;
THE MEDICINE SHOPPE,
d/b/a The Medicine Shoppe-Jeffersonville and
The Medicine Shoppe-Munhall;
WARNER PHARMACY, INC., d/b/a Warner Pharmacy;
WEST VILLAGE PHARMACY, INC.,
d/b/a West Village Pharmacy;
BOWSER CORPORATION, d/b/a Shankel's Pharmacy;
CLAYWELL, INC., d/b/a Medica Pharmacy & Wellness
Center and Medica Pharmacy Bloomfield;
CLINIC PHARMACY, LLC, d/b/a Clinic Pharmacy;
EVANS CITY DRUG STORE, INC.,
d/b/a Evans City Drug Store;
FAIRMOUNT PHARMACY, INC., d/b/a Fairmount
Pharmacy;
G&R INC., CORP, d/b/a Malheur Drug II
GFJ, INC., d/b/a Broken Arrow Family Drug and
Broken Arrow Family Drug#2;
HIDENWOOD PHARMACY, INC., d/b/a Hidenwood
Pharmacy;
KST GROUP, LLC, d/b/a Valumed Pharmacy-Sioux City;
KAPAA PHARMACY (S-Corp), d/b/a Kapaa Pharmacy;
LIHUE PHARMACY (S-CORP), d/b/a Lihue Pharmacy
Group;

12

M.D. CO., INC., d/b/a M.D. Pharmacy;
MELROSE PHARMACY, LLC, d/b/a Melrose Pharmacy;
MILLERSBURG PHARMACY, INC., Millersburg
Pharmacy;
PACIFIC HEALTH MANAGEMENT, LLC,
d/b/a Lihue Professional Pharmacy;
PHARMACY CONSULTANT SERVICES, INC., d/b/a
Turner Drug;
ROCKY TOP PHARMACY, INC., d/b/a Longley
Pharmacy;
ROYER PHARMACY, INC.;
SANO VITO, INC. (S.CORP), d/b/a Rivergate Pharmacy;
SHELTONS PHARMACY, INC., d/b/a A Village
Pharmacy;
SUMPTER PHARMACY, INC., d/b/a Sumpter Pharmacy
& Wellness;
TAYLOR DRUG OPERATING SERVICES, INC.,
d/b/a Taylor Drug Operating Services;
THE MEDICINE CENTER, LLC, d/b/a The Medicine
Center;
BLUEGRASS RX, LLC, d/b/a Bluegrass Pharmacy;
BROAD & GRANGE, INC., d/b/a Broad & Grange
Pharmacy;
BROAD & LEHIGH PHARMACY, INC., d/b/a Broad &
Lehigh Pharmacy;
CHOICE FAMILY PHARMACY, INC., d/b/a Choice
Family Pharmacy;
ELU, INC., d/b/a Point Breeze Pharmacy;

13

EAST BERLIN PHARMACY, INC., d/b/a East Berlin
Pharmacy;
FAMILY PHARMACY PROFESSIONAL
ASSOCIATION,
(Sub S Corp.), d/b/a Family Pharmacy P.A.;
FINO'S PHARMACY, LLC, d/b/a Fino's Pharmacy-Dallas;
GREATER FALLS PHARMACY, INC.,
d/b/a Greater Falls Pharmacy;
HEALME, INC., d/b/a Hometown;
HERITAGE PHARMACY, INC., d/b/a Heritage
Pharmacy;
HOWES PHARMACY, LLC, d/b/a Howes Pharmacy;
KB PHARMACY, LLC, d/b/a Grafton Drug;
MATSTE, INC., d/b/a Hometown Pharmacy-Brookfield;
MED-FAST PHARMACY, INC.;
MILAN PHARMACY, INC., d/b/a King Pharmacy;
KRYNICKI, INC., d/b/a Hometown Pharmacy-Dierkens;
TADEK, INC., d/b/a Hometown Pharmacy-Cornersburg
and Hometown Pharmacy-Struthers;
TADMAR, INC., d/b/a Hometown Pharmacy-Girard;
CMV PHARMACY, INC., d/b/a Manlius Pharmacy;
HEIN-LUN, INC., d/b/a Neff Surgical Pharmacy;
LION PHARMACY, INC., d/b/a Lion Pharmacy;
MARYSIA, INC., d/b/a Hometown Pharmacy-Harmony;
NEWTKO, INC.; d/b/a Port Allegheny Pharmacy;
NORLAND AVENUE PHARMACY, LLC,
d/b/a Norland Avenue Pharmacy;
OAK LANE PHARMACY, INC., d/b/a Oak Lane

14

Pharmacy;
PATTERSON FAMILY PHARMACY, INC.,
d/b/a Patterson Family Pharmacy;
RX EXPRESS PRESCRIPTION SERVICES, INC.,
d/b/a Rx Express Prescription Services;
RICHLANDS PHARMACY ASSOCIATES,
d/b/a Richalands Pharmacy;
SAV-MOR PHARMACY, INC., d/b/a Sav-Mor Pharmacy;
ST. MARY'S PHARMACY, INC., d/b/a St. Mary's
Pharmacy;
Stemat, INC., d/b/a Hometown Pharmacy-New Castle;
STONEWOOD VILLAGE PHARMACY, INC.,
d/b/a Stonewood Village Pharmacy;
WANDAROO, INC.;
CITY DRUGS CO OF JEFFERSON TX, d/b/a City Drug;
FRANKLIN SQUARE PHARMACY, INC.,
d/b/a Franklin Square Pharmacy;
KULER DRUGS, LLC, d/b/a Med Depot Pharmacy;
LEHAN DRUGS, INC., d/b/a Lehan Drugs;
LUKE'S FAMILY PHARMACY, d/b/a Luke's Family
Pharmacy;
MATTHEWSON DRUG CO., INC., d/b/a Matthewson
Drug Co.;
NEFF DRUGS 9, LLC, d/b/a Sunray Drugs Progress Plaza;
PINE STREET PHARMACY, d/b/a Stacy's Family
Pharmacy;
PURDY PHARMACY, INC., d/b/a Purdy Costless Rx;
RJMTZ PHARMACY, LLC, d/b/a The Pharmacy Corner;

15

RX SHOPS, INC., d/b/a Hometown Pharmacy;
READINGS COMMUNITY PHARMACY, INC., d/b/a
R&R Pharmacy;
S&R DRUG CO. (S-Corp), d/b/a S&R Drug Co.;
SAN JUAN PHARMACY, INC., d/b/a San Juan
Pharmacy;
THE COUNTRY SQUIRE DISCOUNT PHARMACY,
INC.,
d/b/a The Country Squire Discount Pharmacy;
URBAN SPECIALTY PHARMACY, LLC,
d/b/a Urban Specialty Pharmacy;
S&B HEALTH SYSTEMS, LLC,
d/b/a West Cocoa Pharmacy & Compounding;
DAVID J. GREENLEE, d/b/a Ross Grant Avenue
Pharmacy;
JAK PHARMA, INC., d/b/a Arthur Avenue Pharmacy;
JEN PHARMA, INC., d/b/a Summer Ave Pharmacy;
MEDICAP SPECIALTY SERVICES, d/b/a Medicap
Specialty Services;
NEFF DRUGS 23 LLC, d/b/a Allegheny Apothecary;
NEFF DRUGS 24, LLC, d/b/a Holmesburg Pharmacy;
STAR PHARMACY SERVICES, INC., d/b/a Paoli
Pharmacy;
UNIVERSITY PHARMACY, INC., d/b/a University
Pharmacy;
VIJAN PHARMA, INC., d/b/a Sure Drugs;
ESTATE OF THEODORE BILLINGER
Brent Billinger, Personal Representative;

16

v.

OPTUMRX, successor by merger to Catamaran
Corporation,
Appellant

_____


On Appeal from the United States District Court
for the Middle District of Pennsylvania
District Court No. 3-17-cv-01102
District Judge:  The Honorable Malachy E. Mannion

_____


Argued March 3, 2022


Before: McKEE, AMBRO, and SMITH, *Circuit Judges*


(Filed:  August 4, 2022)



Lucas C. Townsend   ARGUED
Gibson Dunn & Crutcher
1050 Connecticut Avenue, N.W.
Washington, DC 20036
        *Counsel for Appellant*

Mark R. Cuker        ARGUED
Suite 1120

17

2005 Market Street
Philadelphia, PA 19103
  *Counsel for Appellee*

---

OPINION OF THE COURT

---

SMITH, *Circuit Judge.*

Over 400 pharmacies joined forces in a lawsuit against OptumRX (Optum), a pharmacy benefits manager, alleging breaches of contract and breaches of duties of good faith and fair dealing, together with violations of certain state statutes. Pointing to arbitration agreements found in various contracts covering almost all of those pharmacies, Optum moved to compel arbitration. The pharmacies opposed the motion, arguing that compelling arbitration would be unconscionable. The District Court agreed with the pharmacies, and Optum timely appealed.

We conclude that the District Court erred by applying the wrong standard in ruling on Optum's motion. Per *Guidotti v. Legal Helpers Debt Resolution, LLC*, 716 F.3d 764 (3d Cir. 2013), the District Court—after concluding the pharmacies brought forth sufficient facts to place the arbitration agreements in question—should have allowed discovery limited to the question of arbitrability and then provided Optum an opportunity to renew its

18

motion. It did neither. We will therefore vacate in part the District Court's order denying Optum's motion to compel arbitration and remand with instructions.

## I. Facts & Procedural History

Optum is a pharmacy benefits manager (PBM) responsible for administering prescription drug programs on behalf of health-insurance plans. Optum and its predecessors[1] entered into 41 contracts with, in total, over 400 pharmacies.[2] Twenty of the pharmacies negotiated their contracts with Optum directly; others used bargaining agents known as pharmacy services administrative organizations (PSAOs). Each of these contracts consists of two documents that refer to, and incorporate, each other. The first is the Provider Manual, which covers, *inter alia*, claim submission, pricing, and provider audits. The contents of the Provider Manual do not vary across the many contractual relationships. Then, there are the Provider Agreements, which are specific to

---

[1] The contracts at issue in this appeal are, in some instances, between pharmacies and other PBMs, which later merged into Optum. It is, however, undisputed that Optum is the proper party for each of the contracts.

[2] Up to nine pharmacies' relationships with Optum are governed by contracts that Optum is unable to locate. So these pharmacies were not included in the motion to compel arbitration, and their contracts are not among the 41 contracts described herein.

their signing parties and which address matters such as pharmacy responsibilities and reimbursement rates. But while each contract consists of these two documents, the pharmacies allege that only those pharmacies that negotiated with Optum directly received copies of their Provider Agreements.

The pharmacies banded together and, in June 2017, brought a mass action in the United States District Court for the Middle District of Pennsylvania. They alleged that Optum: (1) paid them less than they were due under their contracts; (2) breached its duties of good faith and fair dealing; and (3) violated certain state statutes. In early 2018, Optum moved to compel arbitration of all but nine pharmacies' claims,[3] relying on arbitration provisions within the Provider Agreements.[4] Each pharmacy that

---

[3] Optum concedes that these nine pharmacies are not subject to arbitration.

[4] Optum also sought outright dismissal of all pharmacies' claims. Generally, per Optum's motion, the pharmacies failed to state a claim for which relief could be granted. Additionally, the District Court, again per Optum's motion, would lack subject matter jurisdiction over those pharmacies that were not subject to arbitration agreements if arbitration were to be compelled for the other pharmacies. The District Court granted Optum dismissal, in part, for failure to state a claim but denied as moot the request to dismiss for lack of subject matter jurisdiction. These aspects of the District Court's ruling are not presently before us.

negotiated through PSAOs opposed arbitration as procedurally unconscionable on grounds that the arbitration provisions were contained in their Provider Agreements and that those Provider Agreements were unavailable to them at all relevant times. The pharmacies that negotiated directly with Optum did not initially oppose the motion but did so later, advancing a theory of substantive unconscionability.

Three years after Optum filed its motion to compel arbitration, the District Court denied the motion in full. The Court held that "compelling [the pharmacies] to proceed with arbitration in this matter would be procedurally unconscionable" because Optum "prohibit[ed] PSAOs from giving the Provider Agreement to the individual pharmacies . . . , making it impossible for the pharmacies to have any knowledge of the arbitration agreement." Dist. Ct. Op., App'x at 10–13. Optum timely appealed.

## II. Jurisdiction

Always, this Court's "first and fundamental question is that of jurisdiction." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998) (quoting *Great S. Fire Proof Hotel Co. v. Jones*, 177 U.S. 449, 453 (1900)). The establishment of jurisdiction is "a threshold matter," and without it "the court cannot proceed at all." *Id.* (quoting *Ex Parte McCardle*, 74 U.S. (7 Wall.) 506, 514 (1868)).

21

We thus raised, *sua sponte*,[5] the question of whether 28 U.S.C. § 1332(d)(11) gives district courts subject matter jurisdiction over mass actions that were brought originally in federal court as opposed to those that were removed from state court.

## A. Background on Mass Actions

Because the mass action is less common than other forms of aggregate litigation—namely the Rule 23 class action and the Fair Labor Standards Act opt-in collective action—we begin with a look at just what it is and how the device came to be. Congress created the mass action in 2005, when it passed the Class Action Fairness Act (CAFA), a mostly jurisdictional statute. That legislation "provid[ed] for Federal court consideration of interstate cases of national importance under diversity jurisdiction" in an effort to minimize state and local courts' "[a]buses in class actions undermin[ing] the national judicial system." Pub L. No. 109-2, § 2(a)(4) & 2(b)(2), 119 Stat. 4 (2005). Through CAFA, Congress "ma[de] it easier both for plaintiffs to establish federal jurisdiction in original federal class actions and for defendants to remove class actions from the state courts." Emery G. Lee III &

---

[5] Optum challenged whether 28 U.S.C. § 1332(d)(11) provided subject matter jurisdiction before the District Court in its reply brief in support of its motion. The District Court did not, however, address its jurisdiction, nor did Optum reassert its challenge before us.

Thomas E. Willging, *The Impact of the Class Action Fairness Act on the Federal Courts: An Empirical Analysis of Filings and Removals*, 156 U. PA. L. REV. 1723, 1734 (2008).  But "CAFA's legislative sponsors realized that CAFA's core class action provisions would not comprehensively reach all problematic state court complex litigation" because most states permitted large-scale aggregation of claims through joinder or other procedural mechanisms.  Linda S. Mullenix, *Class Actions Shrugged: Mass Actions and the Future of Aggregate Litigation*, 32 REV. LITIG. 591, 606 (2013).  For example, two states did not provide for class-action litigation at the time of CAFA's enactment and allowed collective litigation only through non-class joinder and consolidation rules.  *Id.* at 606 & n.53.  Consequently, "CAFA's drafters feared that large-scale state litigation—deemed mass actions and brought under non-class joinder and consolidation rules—would evade CAFA's removal provisions simply because [such] litigation was not pursued under class action rules."  *Id.* at 606–07.

So Congress included mass-action provisions in CAFA.  The Act defined a mass action as

> any civil action (except a civil action within the scope of section 1711(2)) in which monetary relief claims of 100 or more persons are proposed to be tried jointly on the ground that the plaintiffs' claims involve common questions of law or fact, except that

23

jurisdiction shall exist only over those plaintiffs whose claims in a mass action satisfy the jurisdictional amount requirements under [§ 1332(a)].

28 U.S.C. § 1332(d)(11)(B)(i). In essence, mass actions are collective actions that utilize large-scale joinder or other consolidation mechanisms rather than class certification pursuant to Rule 23. For this reason, "a mass action has no representative or absent members," and is "more akin to an opt-in than it is to a class action." *Abraham v. St. Croix Renaissance Grp., L.L.L.P.*, 719 F.3d 270, 272 n.1 (3d Cir. 2013); *see also Mississippi ex rel. Hood v. AU Optronics Corp.*, 571 U.S. 161, 173–74 (2014) (rejecting a purported mass action consisting of 1 named plaintiff and 100 or more unspecified individuals). But still, the Senate Judiciary Committee described mass actions as "class actions in disguise." S. Rep. No. 109-14 (2005). Accordingly, mass actions are deemed to be class actions removable under 28 U.S.C. § 1332(d)(2)–(10) if they otherwise meet the provisions of those paragraphs.[6] 28 U.S.C. § 1332(d)(11)(A).

---

[6] As the Ninth Circuit has noted, "[s]ome of these provisions in § 1332(d)(2)–(10), however, make no sense in the context of a mass action." *Abrego Abrego v. Dow Chem. Co.*, 443 F.3d 676, 680 n.6 (9th Cir. 2006) (per curiam).

24

## B. Mass-Action Jurisdiction

Surprisingly, whether the district courts may exercise original jurisdiction over mass actions is unsettled. Section 1332(d)(2) grants original jurisdiction over certain class actions.[7] And Section 1332(d)(11)(A) states that a mass action is "deemed to be a class action *removable* under" paragraphs (d)(2) through (10) if it otherwise meets the conditions of those paragraphs.[8] The question presented here is whether district courts have jurisdiction over mass actions brought originally before them through paragraph (2), or whether they have jurisdiction over only mass actions which are removed from state court by defendants pursuant to paragraph (11).

Optum urges us to hold that the District Court lacked original jurisdiction. In doing so, Optum advances four arguments: (1) the plain text of CAFA makes clear that mass actions are only removable to federal courts but

---

[7] Section 1332(d)(2) relevantly provides: "The district courts shall have original jurisdiction of any civil action in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and is a class action in which [] any member of a class of plaintiffs is a citizen of a State different from any defendant . . . ."

[8] Section 1332(d)(11)(A) provides: "For the purposes of this subsection and section 1453, a mass action shall be deemed to be a class action removable under paragraphs (2) through (10) if it otherwise meets the provisions of those paragraphs."

that this action *originated in* federal court; (2) purpose statements within CAFA and its legislative history show that Congress did not intend to provide original jurisdiction over mass actions; (3) courts and scholars have doubted that CAFA provides original jurisdiction over mass actions; and (4) there is no alternate basis for subject matter jurisdiction if the Court agrees with Optum's interpretation of § 1332(d)(11).

The pharmacies urge us to reach the opposite conclusion. First, they insist that we adopt the reasoning of district courts that have recognized the availability of original jurisdiction of mass actions under 28 U.S.C. § 1332(d)(11). They then insist that, "should this Court determine an ambiguity exists with respect to the scope of jurisdiction authorized by 1332(d)(11), the legislative history and intent of CAFA require that this ambiguity be resolved in favor of federal courts having original jurisdiction." Pharmacies Supp. Br. at 1. Alternatively, the pharmacies ask that the Court dismiss the three non-diverse plaintiffs that prevent use of standard diversity jurisdiction.

Our "primary purpose in statutory interpretation is to discern legislative intent." *Morgan v. Gay*, 466 F.3d 276, 277 (3d Cir. 2006). And in so doing, we must begin with the statute's text. *Ross v. Blake*, 578 U.S. 632, 638 (2016). "If the statute's plain language is unambiguous and expresses Congress's intent with sufficient precision, we need not look further." *Douglass v. Convergent*

26

*Outsourcing*, 765 F.3d 299, 302 (3d Cir. 2014) (alteration adopted) (quoting *In re Lord Abbett Mut. Funds Fee Litig.*, 553 F.3d 248, 254 (3d Cir. 2009)).  But on occasion, plain and unambiguous language ends up stating what was *not* Congress's intent.  In these instances, "we are obligated to 'construe statutes sensibly and avoid constructions which yield absurd or unjust results.'" *Id.* (quoting *United States v. Fontaine*, 697 F.3d 221, 227 (3d Cir. 2012)); *see also United States v. Am. Trucking Ass'ns, Inc.*, 310 U.S. 534, 543 (1940) ("[E]ven when the plain meaning did not produce absurd results but merely an unreasonable one 'plainly at variance with the policy of the legislation as a whole' this Court has followed that purpose rather than the literal words." (footnote omitted) (quoting *Ozawa v. United States*, 260 U.S. 178, 194 (1922))); *Morgan*, 466 F.3d at 278 (quoting *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 242 (1989)).

CAFA includes the following relevant provisions:

CAFA § 2(a)(4)(A)—

> Congress finds th[at] . . . [a]buses in class actions undermine the national judicial system, the free flow of interstate commerce, and the concept of diversity jurisdiction as intended by the framers of the United States Constitution, in that State and local courts are [] keeping cases of national importance out of Federal court;

27

CAFA § 2(b)—

> The purposes of [CAFA] are to [] assure fair and prompt recoveries for class members with legitimate claims[,] restore the intent of the framers of the United States Constitution by providing for Federal court consideration of interstate cases of national importance under diversity jurisdiction[,] and benefit society by encouraging innovation and lowering consumer prices;

CAFA § 4(a)(2) (codified at 28 U.S.C. § 1332(d)(2)(A))—

> The district courts shall have original jurisdiction of any civil action in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and is a class action in which [] any member of a class of plaintiffs is a citizen of a State different from any defendant;

CAFA § 4(a)(2) (codified at 28 U.S.C. § 1332(d)(11)(A))—

> For purposes of this subsection and section 1453, a mass action shall be deemed to be a class action removable under paragraphs (2) through (10) if it otherwise meets the provisions of those paragraphs;

28

CAFA § 4(a)(2) (codified at 28 U.S.C. § 1332(d)(11)(C)(i))—

> Any action(s) removed to Federal court pursuant to this subsection shall not thereafter be transferred to any other court . . . unless a majority of the plaintiffs in the action request transfer . . .; and

CAFA § 4(a)(2) (codified at 28 U.S.C. § 1332(d)(11)(D))—

> The limitations periods on any claims asserted in a mass action that is removed to Federal court pursuant to this subsection shall be deemed tolled during the period that the action is pending in Federal court.

Optum and the pharmacies seem to agree that 28 U.S.C. § 1332(d)(2) provides that district courts have CAFA original jurisdiction only over civil actions that are class actions, but they disagree as to when mass actions are class actions per 28 U.S.C. § 1332(d)(11)(A) and thus fall within that grant of original jurisdiction. Optum argues that mass actions are deemed class actions only for removal purposes. The pharmacies, on the other hand, argue that mass actions are deemed class actions generally.

29

Optum and the pharmacies both advance readings of § 1332(d)(11) that are plausible,[9] but neither reading can be characterized as clearly correct. By Optum's reading, mass actions would not be class actions within district courts' original jurisdiction because mass actions are only class actions when "removable under paragraphs (2) through (10)."[10] This reading, however, raises as many

[9] Given that the text can be read several ways, it is not surprising that relevant treatises reveal a split on the question. *Compare* Wright & Miller § 3601 ("[CAFA] provides the federal courts with original jurisdiction over a class or mass action when . . . .") *with* 2 Newberg on Class Actions § 6:24 ("[CAFA] does not enable original jurisdiction over mass actions; it only states that such actions are subject to removal."). These contrasting views betray both sides' claims that the scholarly literature decisively favors their respective positions.

[10] Optum also argues that other subparagraphs suggest that all of § 1332(d)(11) was focused only on removal. We find no support for that position in the language of those subparagraphs. The emphasis on removed actions in § 1332(d)(11)(C)(i) would make sense regardless of whether original jurisdiction was granted because transferability is less of a concern where the plaintiffs chose which court would ultimately hear their claims. And § 1332(d)(11)(D)'s emphasis on removed actions would also make sense regardless of whether original jurisdiction was granted because mass-action jurisdiction "exist[s] only over those plaintiffs whose claims in a mass action satisfy the jurisdictional amount requirements," 28 U.S.C. § 1332(d)(11)(B)(i), and courts sometimes dismiss

30

questions as it answers because paragraphs (2) through (10) do not concern removal.  Paragraph (11) is prefaced by language of applicability to subsection (d) and to section 1453, and section 1453 provides that class actions are removable pursuant to section 1446.[11]  So deeming a mass action a class action if it otherwise meets the provisions of paragraphs (2) through (10) would make it removable—but under section 1453, not under paragraphs (2) through (10).  More importantly, because section 1453 is the basis for removal, what other purpose would Congress have had in treating mass actions as class actions under subsection (d) if not to establish original jurisdiction?

---

dispensable parties that would defeat jurisdiction, Federal Rule of Civil Procedure 21.  So unlike those brought originally in federal court, tolling statutes of limitations is necessary for removed actions.

[11] Section 1446 provides that "[a] defendant or defendants desiring to remove any civil action from a State court shall file in the district court of the United States for the district and division within which such action is pending a notice of removal . . . containing a short and plain statement of the grounds for removal."  And section 1453(b) provides that, in general, "[a] class action may be removed to a district court of the United States in accordance with section 1446 . . . without regard to whether any defendant is a citizen of the State in which the action is brought, except that such action may be removed by any defendant without the consent of all defendants."

31

As for the pharmacies' reading, mass actions could be generally deemed class actions for purposes of subsection (d) and section 1453. Such a reading would provide district courts with original jurisdiction through § 1332(d)(2). Yet if we interpret the language that way, we are left with the extraneous and unexplained "removable under" language. Interpreting § 1332(d)(11) in a manner that ignores parts of its text—as both Optum and the pharmacies ask us to do—would "violat[e] the cardinal rule that, if possible, effect shall be given to every clause and part of a statute." *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012) (quoting *D. Ginsberg & Sons, Inc. v. Popkin*, 285 U.S. 204, 208 (1932)).

We express the same frustrations as have two of our sister circuits as we attempt to make sense of CAFA's mass-action provisions. *See Abrego Abrego v. Dow Chem. Co.*, 443 F.3d 676, 680–82 (9th Cir. 2006) (per curiam); *Lowery v. Ala. Power Co.*, 483 F.3d 1184, 1200 n.41 (11th Cir. 2007). In calling the drafting of the relevant subsection "clumsy," the Ninth Circuit also observed:

> Congress's use of the word "removable" in the text of § 1332, a statute establishing original jurisdiction, blurs what had previously been a clear distinction between jurisdiction and removal statutes, and thus obscures the reach of jurisdiction over mass actions. Because Congress did not refer to

32

original jurisdiction in either the mass action provision itself, or in § 1453, the text does not answer the important question of when there is original federal jurisdiction over mass actions, and what the scope of that original jurisdiction might be.

*Abrego Abrego*, 443 F.3d at 682. The Eleventh Circuit went beyond the Ninth's use of the word "clumsy": "CAFA's mass action provisions present an opaque, baroque maze of interlocking cross-references that defy easy interpretation, even though they are contained in a single paragraph . . . ." *Lowery*, 483 F.3d at 1198 (footnote omitted). In a different context, and without mentioning the "removable under" language, *Lowery* took the position that mass actions are generally deemed class actions. *Id.* at 1199. But the *Lowery* Court nevertheless concluded that "[i]t is not clear . . . whether a group of plaintiffs who, choosing not to certify as a class, but otherwise meeting the requirements for a mass action, would be permitted to file a mass action originally in a district court." *Id.* at 1200 n.41. So while both the Ninth and Eleventh Circuits recognized that Congress was not clear about conferring on district courts jurisdiction over mass actions, neither court needed to resolve the issue in the case before it.

33

Looking beyond the CAFA provisions that made their way into the *United States Code*[12] does make our task easier. *See King v. Burwell*, 576 U.S. 473, 492 (2015) ("A provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme . . . because only one of the permissible meanings produces a substantive effect that is compatible with the rest of the law." (alteration in original) (quoting *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 371 (1988)). A statutory statement of purpose is "an appropriate guide to the meaning of the statute's operative provisions." *Gundy v. United States*, 139 S. Ct. 2116, 2126–27 (2019) (interpreting a provision in light of its purpose statement); *see also POM Wonderful LLC v. Coca-Cola Co.*, 573 U.S. 102, 106–07 (2014) (interpreting the Lanham Act in light of its "detailed statement of the statute's purposes"). In CAFA itself, Congress found that "keeping cases of national importance out of Federal court" was "undermin[ing] the national judicial system, the free flow of interstate commerce, and the concept of diversity jurisdiction as intended by the framers of the United States Constitution." CAFA § 2(a)(4)(A). So

---

[12] Section 2 of CAFA contains the findings of Congress and a statement regarding the Act's purposes. This section was not formally codified within the *United States Code*, though it is included as a Note appended to 28 U.S.C. § 1711. Regardless, it is part of the law. *See U.S. Nat'l Bank of Or. v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 448 (1993) (concluding that a provision omitted from the *Code* is valid law).

Congress enacted CAFA for the explicit purpose of "restor[ing] the intent of the framers of the United States Constitution by providing for Federal court consideration of interstate cases of national importance under diversity jurisdiction." CAFA § 2(b); *see also Std. Fire Ins. Co. v. Knowles*, 568 U.S. 588, 595 (2013) (mentioning CAFA's "primary objective").

Congress's explicit purpose in enacting CAFA supports a conclusion that the District Court had original jurisdiction here. Congress sought to "provid[e] for Federal court consideration of interstate cases of national importance under diversity jurisdiction." CAFA § 2(b)(2). It would seem, then, passing strange to construe ambiguous language as *preventing* a plaintiff from asking a federal court to consider an interstate case of national importance pursuant to diversity jurisdiction. True, Congress's mention of removal without any mention of original jurisdiction could tend to imply an intent not to provide original jurisdiction. But because the statutory purpose suggests that the inclusion of removal jurisdiction was not done to the exclusion of original jurisdiction, that implication does not attach. *See Burns v. United States*, 501 U.S. 129, 136 (1991) ("An inference drawn from congressional silence certainly cannot be credited when it is contrary to all other textual and contextual evidence of congressional intent."), *abrogated on other grounds by Booker v. United States*, 543 U.S. 220 (2005). And since Congress's animating concern was state and local courts' tendency to keep class actions for themselves, when

35

examined in light of CAFA's statement of purpose, the text of § 1332(d)(11) is best read as ensuring that qualifying mass actions—like class actions—are not being kept from the federal courts. *See Burwell*, 576 U.S. at 492. For that reason, we interpret § 1332(d)(11) as deeming all mass actions that comport with the requirements of paragraphs (2) through (10) to be class actions within § 1332(d)(2)'s grant of original jurisdiction.

Having settled upon a permissible meaning of § 1332(d)(11) that produces a substantive effect compatible with the purpose of CAFA, we have no occasion to rely on legislative history. *See Mohamad v. Palestinian Auth.*, 566 U.S. 449, 459 (2012); *see also In re Trump Ent. Resorts*, 810 F.3d 161, 168 (3d Cir. 2016) (noting that legislative history should only be relied on "as a last resort"). We have on occasion, however, checked our work by looking to it. *See G.L. v. Ligonier Valley Sch. Dist. Auth.*, 802 F.3d 601, 621–22 (3d Cir. 2015) ("[L]egislative history can play a confirmatory role in resolving ambiguity when statutory language and structure support a given interpretation."). We do so here and conclude that the legislative history supports our interpretation of the statutory language. The Senate Judiciary Committee Report, for example, states that, under § 1332(d)(11), a mass action "will be treated as a class action for jurisdictional purposes. Thus, if such a civil action met the other diversity jurisdictional prerequisites set forth for class actions in this legislation, that civil action would be subject to federal jurisdiction."

36

S. Rep. No. 109-14 at 46 (2005).  It further states that § 1332(d)(11) "expands federal jurisdiction over mass actions." *Id.*  While neither of these statements explicitly states that *original* jurisdiction will expand, it is equally true that neither says *only removal* jurisdiction will expand.  We will not read qualifying language into a statement that contains none; had Congress intended to so limit their expansions, it surely would have given some indication to that effect.

The only legislative history that might support Optum's view is Congress's motivating concern of federal-court evasion, but only if understood as evidence that Congress's purpose was preventing forum shopping.  On the other hand, a Congress concerned with federal-court evasion could simply aim to make the federal courts more accessible.  The latter understanding makes more sense, especially in light of the Judiciary Committee's observation that "mass actions are simply class actions in disguise" and that they "often result in the same abuses as class actions," or sometimes "even worse."  *Id.* at 47.  Optum otherwise relies on language from the Senate Judiciary Committee Report that "a mass action removed to a federal court under this provision may not be transferred to another federal court under the MDL statute" and that, when a mass action is removed, it should stay in federal court "so long as the mass action met the various jurisdictional requirements at the time of removal."  S. Rep. No. 109-14 at 47.  Neither statement

37

even implies that Congress intended to prevent mass actions from being originally brought in federal court.

We therefore agree with the pharmacies and hold that mass actions initiated in federal district court are considered class actions if they otherwise meet the provisions of paragraphs (2) through (10), and that district courts accordingly have original jurisdiction over those mass actions. Because this mass action otherwise meets the provisions of paragraphs (2) through (10), the District Court properly exercised jurisdiction. We exercise jurisdiction under 28 U.S.C. § 1291.

## III. Standard of Review

This appeal comes to us after the District Court's denial of Optum's motion to compel arbitration. Motions to compel arbitration are treated either as motions to dismiss or motions for summary judgment. *Guidotti v. Legal Helpers Debt Resol., LLC*, 716 F.3d 764, 771 (3d Cir. 2013) (AJS, KAJ, JRR). "'Where the affirmative defense of arbitrability of claims is apparent on the face of a complaint (or documents relied upon in the complaint),' 'the [Federal Arbitration Act] would favor resolving a motion to compel arbitration under a motion to dismiss standard without the inherent delay of discovery.'" *Id.* at 773–74 (citations omitted and alterations adopted). In such a case, Rule 12 supplies the appropriate standard. *Id.* But "a more deliberate pace is required" when "'the motion to compel arbitration does not have as its predicate

a complaint with the requisite clarity' to establish on its face that the parties agreed to arbitrate, or the opposing party has come forth with reliable evidence that is more than a 'naked assertion that it did not intend to be bound' by the arbitration agreement." *Id.* at 774 (citations omitted and alterations adopted). In such a case, "Rule 56 furnishes the correct standard." *Id.* at 774–75.

Our first task is to determine which of these two standards applies. *Id.* at 772. Optum was explicit in seeking review of its motion to compel under the Rule 12 standard. Its motion was accordingly limited to the pharmacies' complaint and its contracts with the pharmacies that formed the basis thereof. The District Court was tasked, then, with judging Optum's motion under the Rule 12 standard. *Id.* at 776. And because we "apply the same standard the district court should have applied," that is our task as well. *Id.* at 772 (citing *Exxon Shipping Co. v. Exxon Seamen's Union*, 73 F.3d 1287, 1291 (3d Cir. 1996)).

Under the Rule 12 standard, we will affirm a district court's denial of a motion to compel arbitration if "'the assertions of the complaint, given the required broad sweep, would permit adduction of proofs that would provide a recognized legal basis' for rejecting the affirmative defense." *Id.* at 774 (quoting *Leone v. Aetna Cas. & Sur. Co.*, 599 F.2d 566, 567 (3d Cir. 1979)). In other words, we look to the complaint and the documents on which it relies and will compel arbitration only if it is

39

clear, when read in the light most favorable to the respondents, that the parties agreed to arbitrate. *Id.* at 772 & 776. But even if the complaint and the documents on which it relies do appear to show an agreement to arbitrate, we do not compel arbitration when the respondents have come forward with nonfrivolous evidence that they are not bound by the agreement. *Id.* at 776.

## IV. Analysis

With passage of the Federal Arbitration Act, Congress established "a national policy favoring arbitration when the parties contract for that mode of dispute resolution." *Preston v. Ferrer*, 552 U.S. 346, 349 (2008). And when the parties have done so, arbitration agreements must be enforced according to their terms like any other contract would be. *Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 67 (2010). Like other contracts, arbitration agreements "may be invalidated by 'generally applicable contract defenses, such as fraud, duress, or unconscionability.'" *Id.* at 68 (quoting *Doctor's Assocs., Inc. v. Casarotto*, 517 U.S. 681, 687 (1996)). Here, the District Court concluded that one of these generally applicable defenses—procedural unconscionability—applied, and it therefore denied Optum's motion to compel.

Optum argues that this conclusion was in error for five reasons and urges us to reverse, or alternatively vacate, the District Court's order. First, Optum argues that

40

the pharmacies' procedural-unconscionability defense should have been decided by an arbitrator rather than the District Court. Second, that there was no procedural unconscionability because PSAOs were not prohibited from sharing the Provider Agreements from their constituent pharmacies. Third, that the pharmacies ratified the Provider Agreements and thus vitiated any procedural unconscionability that may have otherwise been present. Fourth, that twenty of the pharmacies did not even claim procedural unconscionability. And fifth, that *Guidotti* requires that Optum be given a chance to engage in discovery limited to the question of arbitrability and a chance to reassert its motion to compel arbitration under the Rule 56 standard. For the reasons discussed below, we will vacate in part the District Court's order denying Optum's motion to compel and remand for proceedings consistent with this opinion.

## A. Who Decides?

Before a court can resolve a dispute arising out of a contract containing an arbitration clause, it must address the "threshold arbitrability question": who decides, the arbitrator or the court? *See Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 527 (2019). Optum argues that the District Court "should have stayed the case and compelled arbitration so that the arbitrator can address [the pharmacies'] procedural unconscionability argument in the first instance." Blue Br. at 39. The pharmacies contend that Optum forfeited this argument by not raising

41

it before the District Court, and that even if it was not forfeited, the District Court was correct in deciding the issue itself. For the following reasons, we agree with the pharmacies.

Arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. In other words, arbitration agreements are placed on equal footing with other contracts and thus may be challenged and invalidated as other contracts are. *Rent-A-Ctr.*, 561 U.S. at 68 ("Like other contracts, [arbitration agreements] may be invalidated by 'generally applicable contract defenses, such as fraud, duress, or unconscionability.'"); *Puleo v. Chase Bank USA, N.A.*, 605 F.3d 172, 179 (3d Cir. 2010) (en banc) (confirming that arbitrability questions may be raised when a party contends that its terms are "unconscionable under generally applicable state contract law"). Challenges to arbitration agreements are classified as either: (1) targeted at "specifically the validity of the agreement to arbitrate"; or (2) targeted at "the contract as a whole, either on a ground that directly affects the entire agreement (*e.g.*, the agreement was fraudulently induced), or on the ground that the illegality of one of the contract's provisions renders the whole contract invalid." *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 444 (2006). Challenges of the first type "go[] to the 'making' of the agreement to arbitrate" and must be adjudicated by the courts. *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395,

42

403–04 (1967); *see also Rent-A-Ctr.*, 561 U.S. at 70. Challenges of the second type, on the other hand, concern the contract "generally" and must be adjudicated by the arbitrator. *Prima Paint*, 388 U.S. at 404.

For a district court, rather than an arbitrator, to consider a challenge to an arbitration agreement, the challenge "must focus exclusively on the arbitration provision." *S. Jersey Sanitation Co. v. Applied Underwriters Captive Risk Assurance Co.*, 840 F.3d 138, 143 (3d Cir. 2016). "[A]bsent a specific challenge to the validity of the arbitration clause specifically, the court must treat [an arbitration agreement] as a valid and enforceable agreement and refer any challenges to the container contract to arbitration." *MZM Constr. Co. v. N.J. Bldg. Laborers Statewide Benefit Funds*, 974 F.3d 386, 397 (3d Cir. 2020). Here, the District Court concluded that the pharmacies "argue[d] . . . that it would be procedurally unconscionable to bind them *to the arbitration agreement* [because] the terms and conditions of *the agreement* were not accessible to them when they entered into their contractual relationship" and proceeded to address the pharmacies' challenge. Dist. Ct. Op., App'x at 10 (emphasis added).

The District Court addressed the pharmacies' challenge without the benefit of *any* argument from Optum that the arbitrability decision was not the District Court's to make. "We generally refuse to consider issues that the parties have not raised below." *Freeman v.*

43

*Pittsburgh Glass Works, LLC*, 709 F.3d 240, 249 (3d Cir. 2013). This refusal "is essential in order that parties may have the opportunity to offer all the evidence they believe relevant to the issues." *Id.* (quoting *Hormel v. Helvering*, 312 U.S. 552, 556 (1941)). And while it is within our discretion to depart from this general rule, we do so only in exceptional circumstances. *Id.*; *Gen. Refractories Co. v. First State Ins. Co.*, 855 F.3d 152, 162 (3d Cir. 2017).

In its reply brief, Optum identifies two instances before the District Court where it raised this argument. Neither is sufficient. The first was a lone citation to *Rent-A-Center* in Optum's motion to compel, before the pharmacies even challenged arbitrability.[13] And that citation supported nothing more than the rule that an arbitration provision shall be valid unless it is specifically challenged. Nothing in the motion to compel can be read as an argument that the District Court was unable to preside over such a specific challenge. It is beyond implausible to read such a simple statement, made before Optum knew the pharmacies were disputing whether they were bound to arbitrate, as an argument that the District Court *had to* stay the case and refer the arbitrability challenge to the arbitrator.

---

[13] Despite submitting numerous briefs relating to its motion, this is the only time that Optum cited any cases relevant to the "who decides" question.

44

The second instance Optum highlights is the following sentence from its response to the pharmacies' second supplemental brief opposing its motion in the District Court: "Plaintiffs argue that the *entire* Provider Agreement was purportedly concealed from them. Accordingly, there is no basis for singling out the arbitration clause as not binding." But again, nothing in this statement amounts to an argument that the District Court should have referred the arbitrability challenge to the arbitrator. Both of these instances are more naturally seen as arguments *to the District Court* about why *it* should have rejected the pharmacies' arbitrability challenge.

Optum also argues that it could not have forfeited this issue because the question of who decides is jurisdictional. Per the Supreme Court, "the word 'jurisdictional' is generally reserved for prescriptions delineating the classes of cases a court may entertain (subject-matter jurisdiction) and the persons over whom the court may exercise adjudicatory authority (personal jurisdiction)." *Fort Bend Cnty. v. Davis*, 139 S. Ct. 1843, 1848 (2019). And the Supreme Court, when discussing a district court's responsibility to give effect to arbitration agreements, has at times used language of that flavor, *e.g.*: "When the parties' contract delegates the arbitrability question to an arbitrator, a court may not override the contract. In those circumstances, *a court possesses no power to decide the arbitrability issue*." *Henry Schein*, 139 S. Ct. at 529 (emphasis added). But placing the weight

45

that Optum does on this language would put the Supreme Court at odds with itself. It has repeatedly held that statutory limitations are to be treated as nonjurisdictional unless Congress clearly states it intends otherwise. *Gonzalez v. Thaler*, 565 U.S. 134, 141–44 (2012) (quoting *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 515–16 (2006)); *see also United States v. Wong*, 575 U.S. 402, 409–10 (2015).

Optum points to no such clear statement by Congress. Instead it directs our attention to section 3 of the FAA, which requires courts to stay trial of an action pending arbitration, and to section 4, which directs courts to order parties to proceed to arbitration when required by an agreement. Both of these statutory provisions undercut Optum's argument. If a court lacks jurisdiction, how could it stay the case or enter an order other than for dismissal? Far from making a clear statement that the FAA strips courts of jurisdiction whenever there is an arbitration agreement, Congress has made a clear statement telling the courts how they are to exercise that jurisdiction.

Sections 3 and 4 of the FAA are not jurisdictional limitations. Further, because Optum did not argue before the District Court that the pharmacies' arbitrability challenge needed to be decided by the arbitrator, we conclude that Optum forfeited its argument that the District Court was required to submit the pharmacies'

arbitrability challenge to the arbitrator.[14]  We therefore refuse to consider the issue.

## B. *Guidotti*

After considering the pharmacies' arbitrability challenge, the District Court concluded that "compelling plaintiffs to proceed with arbitration in this matter would be procedurally unconscionable."  Dist. Ct. Op., App'x at 13.  It reached this conclusion upon finding that "the record demonstrates that the defendant prohibits PSAOs from giving the Provider Agreement to the individual pharmacies without first gaining permission to do so and the defendant has never given such permission, making it impossible for the pharmacies to have any knowledge of the arbitration agreement."  *Id.* at 12.  Optum argues that the record does not actually demonstrate that PSAOs were prohibited from sharing the Provider Agreements from

---

[14] Optum argues that we should nevertheless exercise our discretion to decide the issue because the public interest requires that it be resolved.  Per Optum, the issue of "who decides" arbitrability questions is recurrent and our resolution of the issue may affect contracts beyond the parties before us (including thousands of other pharmacies that Optum contracts with).  We are not convinced these circumstances are exceptional enough to warrant addressing the issue, notwithstanding Optum's forfeiture.  If Optum is party to a similar lawsuit from one of those non-plaintiff pharmacies, it may raise its argument before the appropriate district court.

their constituent pharmacies, and that there was thus no procedural unconscionability.

Under Illinois law—which the parties agree controls here—"[p]rocedural unconscionability exists when a contract term is so difficult to find, read, or understand that the plaintiff cannot fairly be said to have been aware that he or she was agreeing to it." *Zuniga v. Major League Baseball*, — N.E.3d —, No. 1-20-1264, 2021 WL 976958 (Ill. App. Ct. Mar. 16, 2021). In response to Optum's argument, the pharmacies prominently focus on language found in a number of the pharmacies' Provider Agreements, which they contend prevents PSAOs from sharing terms such as the arbitration agreement with the pharmacies. For example, one Provider Agreement provides:

> Unless required to do so by operation of law or order of any court or government authority, Pharmacy will not share information concerning the terms of this Agreement or other proprietary information, including but not limited to, reimbursement rates and pricing as provided to Pharmacy by [Optum], with any other person or entity without the permission of [Optum]. If any such disclosure is made or contemplated, Pharmacy will notify [Optum].

AccessHealth Provider Agreement, Exh. A § 3.3, App'x at 506. While at first blush this may suggest, as Optum

48

argues, that the pharmacies are expected to have access to but not share the Provider Agreement's terms, this contract in particular shows the PSAO signing as "Pharmacy." So when read in the light most favorable to the pharmacies, this Provider Agreement could plausibly prevent the PSAO from sharing the Provider Agreement's terms with any third party, including the PSAO's member pharmacies. Further, the pharmacies came forward with other evidence: a transcript from the deposition of Optum's corporate representative, Kerri Tanner. Tanner was unable to recall any specific times that Optum authorized PSAOs to disclose Provider Agreement terms to non-signatory pharmacies. Otherwise, Tanner provided only vague statements that could be understood to support either view (and are indeed selectively quoted by Optum and the Pharmacies).

Given that Optum brought its motion to compel arbitration under the Rule 12(b)(6) standard, the pharmacies were required to show only that the complaint and its supporting documents were not clear enough on their face to establish that the parties agreed to arbitrate or otherwise "come forth with reliable evidence that is more than a 'naked assertion that it did not intend to be bound' by the arbitration agreement." *Guidotti*, 716 F.3d at 774 (citations omitted). The language of at least some of the Provider Agreements is ambiguous enough that, looking only to the complaint and its relied-upon documents, we cannot say Optum allowed PSAOs to share the terms of the Provider Agreement—and thus the arbitration

49

agreement—with their pharmacies absent authorization to do so. And Tanner's statements suggest that, if authorization was required, it may not have been given. The pharmacies have thus provided more than a naked assertion that they were never given the terms of their Provider Agreements.

Because it is plausible that a number of the pharmacies were never given the terms of their Provider Agreements, it is likewise plausible that holding the pharmacies to the arbitration agreements contained therein would be procedurally unconscionable. *See Zuniga*, 2021 WL 976958, at *5 ("Procedural unconscionability consists of some impropriety during the process of forming the contract depriving a party of a meaningful choice." (quoting *Kinkel v. Cingular Wireless, LLC*, 223 Ill.2d 1, 23 (2006))). So we agree with the District Court that the pharmacies "brought forth sufficient facts to place the agreement to arbitrate in issue." Dist. Ct. Op., App'x at 6. Optum's motion to compel arbitration, brought under the Rule 12(b)(6) standard, then, should have been denied. But the District Court did not stop there.

Without providing for discovery as to arbitrability and without allowing Optum to bring a Rule 56-styled motion to compel arbitration, the District Court proceeded to judge Optum's motion by the Rule 56 standard. *Guidotti* explains that the appropriate procedure for converting motions brought under the Rule 12 standard to motions brought under the Rule 56 standard "mirrors the

50

process provided by Rule 12(d)." 716 F.3d at 775 n.6. That rule says "that 'if, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56,' and 'all parties must be given a reasonable opportunity to present all the material that is pertinent to the motion.'" *Id.* (alterations omitted) (quoting Fed. R. Civ. P. 12(d)). This means that "[o]nce the motion is converted to a motion for summary judgment, reasonable allowance must be made for the parties to obtain discovery. Otherwise, weighing the new factual assertions against the facts pleaded in the complaint would 'invite courts to consider facts and evidence that have not been tested in formal discovery.'" *Id.* (citations and alterations omitted) (quoting *Pfeil v. State St. Bank & Trust Co.*, 671 F.3d 585, 594 (6th Cir. 2012), *abrogated on other grounds by Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409 (2014)).

This formal discovery, limited to the question of arbitrability, may then be followed by a renewed motion to compel arbitration wherein both the moving and non-moving parties' arguments can be supported by a developed record. *Id.* at 776. To proceed otherwise would plainly disadvantage moving parties because they would be limited to the complaint, exhibits attached to the complaint, matters of public record, and undisputedly authentic documents relied upon by the complaint, even when non-moving parties introduced and relied on other evidence in opposition. *Id.* at 772.

51

*Guidotti*, then, requires a district court to allow discovery on the question of arbitrability after it has denied a motion to compel arbitration under the Rule 12(b)(6) standard. *Id.* at 776. The District Court noted *Guidotti*'s requirement but nevertheless declared that "the parties have already engaged in discovery and have submitted supplemental filings with the court in relation to the issue of arbitrability."[15] It was, therefore, the District Court's view that adhering to *Guidotti* was a waste of time. Dist. Ct. Op., App'x at 6. That was error, so we will vacate the District Court's order in part and remand to allow the parties to conduct discovery limited to the issue of arbitrability. After the conclusion of such discovery, Optum will then have an opportunity to file a new motion under the appropriate standard.

Before concluding, we note that the District Court did not provide any citations to the record in support of its finding that "the record demonstrates that [Optum] prohibits PSAOs from giving the Provider Agreement to

---

[15] The District Court seems to be mistaken about the discovery that had taken place. Optum had conducted discovery as to the nine pharmacies with which it did not seek to compel arbitration, but not as to the pharmacies with which arbitrability was at issue. Regardless, any discovery that might have occurred with respect to arbitrability after the filing of Optum's original motion would be of little use without a later opportunity to move to compel arbitration under the Rule 56 standard.

52

the individual pharmacies without first gaining permission to do so." Because we apply the same standard of review the District Court should have applied, *Guidotti*, 716 F.3d at 772, we have examined the record and found support for the finding in the Provider Agreement set forth in Exhibit A and in other Provider Agreements. But that particular Provider Agreement may not be representative of other pharmacies' Provider Agreements. We note two examples. The Provider Agreement set forth in Exhibit D appears to contain the same confidentiality clause as the Provider Agreement in Exhibit A, but "Pharmacy" therein is defined more broadly—as each of the PSAO's participating member pharmacies—and the Provider Agreement set forth in Exhibit P does not appear to contain the same confidentiality clause as the others. Moreover, as Optum and the pharmacies note, twenty of the pharmacies made no claim of procedural unconscionability. Because the issue is being remanded to the District Court, which will soon have before it a renewed motion, the District Court will be in a better position to make, in the first instance, factual findings regarding which, if any, of the pharmacies were prevented from accessing the terms of their Provider Agreements. It will also be in a better position to determine, in the first instance, whether certain pharmacies' *substantive* unconscionability claims have merit or (as raised for the first time in Optum's reply brief) are preempted by the FAA.

53

## V. Conclusion

For the foregoing reasons, we will vacate in part[16] and remand to the District Court for further proceedings consistent with this opinion.

---

[16] The District Court also ordered dismissal of various claims. The dismissals are not challenged here.